Barbara J. BLOMGREN, Plaintiff,

v.

Ronald C. OGLE and Sandra J. Ogle, d/b/a Ogle Enterprises, and Shannon Koch, Defendants.

No. CS–92–389–CI.

United States District Court, E.D. Washington.

July 13, 1993.

Jon Erik Mueller, Spokane Legal Services, Spokane, WA, for plaintiff.

Barry E. Ryan, J. Gregory Casey, Stanley A. Kempner, Spokane, WA, for defendants.

**MEMORANDUM AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND AMENDING SCHEDULING ORDER**

IMBROGNO, United States Magistrate Judge.

### INTRODUCTION

BEFORE THE COURT is Plaintiff's Motion for Summary Judgment pursuant to 28 U.S.C. §§ 2201–2202, argued orally June 24, 1993. (Ct.Rec. 43.) Attorney Jon Mueller, Spokane Legal Services represented Plain-

tiff; attorney Barry E. Ryan represented Defendants. The parties have consented to proceed before the Magistrate Judge. (Ct. Rec. 22.) After consideration of the parties' oral arguments, pleadings, affidavits, depositions, exhibits and the court's file, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

Plaintiff filed suit on October 8, 1992, pursuant to the Fair Housing Act, 42 U.S.C. § 3601, et seq.[1] Plaintiff claims Defendants are discriminating against her on the basis of familial status[2] because she has a minor son. Plaintiff moves the court for summary judgment on the issue of Defendants' liability and a declaration stating Defendants violated 42 U.S.C. §§ 3604(a), (b) and (c).

In 1988, Congress amended the Fair Housing Act with the purpose of eliminating direct discrimination against families with children. Congress noted racial segregation was exacerbated by the exclusion of families with children in the sale or rental of a dwelling. H.R.Rep. No. 711, 100th Cong., 2d Sess. 19, reprinted in 1988 U.S.C.C.A.N. 2173, 2180, 2182. The Amendments were "carefully crafted to protect American families, without placing an undue burden on owners and landlords." 134 Cong.Rec. H4687 (daily ed. June 23, 1988) (remarks by Representative Pelosi). The Amendments went into effect March 12, 1989.

## BACKGROUND AND FACTS

### Defendants and Their Agents.

Defendants Ronald C. and Sandra J. Ogle, husband and wife, reside in Chattaroy, Washington. (Plaintiff's Amended Complaint, Ct.Rec. 5, at 2; Defendants' Answer, Ct.Rec. 14, ¶ II.) They own three apartment complexes, one of which is the Roost Apartment complex, located at E. 8910 Broadway, Spokane, Washington, and operate these complexes as small business owners doing business as Ogle Enterprises. (Ronald Ogle Deposition, Ct.Rec. 47, at 9.) They have owned the Roost Apartment complex since April 30, 1975. (Affidavit of Ron Ogle, Ct. Rec. 13, App. 5, at 1.)

Defendants Ogle perform most of the maintenance and upkeep themselves and resident managers assist with the management of the apartment. (Affidavit of Ronald Ogle, Ct.Rec. 51, Ex. 10.)

Defendant Shannon Koch, the current manager of the Roost Apartments, lives in unit 19. (Shannon Koch Deposition, Ct.Rec. 46, at 7.) She has been the resident manager since November 1991. (Affidavit of Shannon Koch, Ct.Rec. 13, App. 6, at 1.)

Kurt Alsperger managed the Roost Apartments from April 1984 to August 1989. (Affidavit of Kurt Alsperger, Ct.Rec. 13, App. 2, at 1.) Todd Bircher managed the Roost Apartments for Defendants from August 1989 through August 1991. (Ogle Deposition, Ct.Rec. 46, at 13.) Max Salazar managed the Roost between the time Mr. Bircher left and Defendant Koch became resident manager. (Id.)

### Structure of the Roost Apartments.

The Roost Apartment complex contains 19 units. (Ogle Deposition, Ct.Rec. 46, at 12.) Of the 19 apartments at the complex, only two are two-bedroom units, the other 17 are one-bedroom units. (Ct.Rec. 51, Todd Birch-

---

1. The Fair Housing Act provides in pertinent part:
[I]t shall be unlawful—
(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, or national origin, or an intention to make such preference, limitation, or discrimination. 42 U.S.C. § 3604(a)–(c).

2. Familial status is defined as "one or more individuals (who have not attained the age of 18 years) being domiciled with ... a parent." 42 U.S.C. § 3602(k)(1).

er Deposition, at 56–59; Ogle Deposition, at 12, 30–31; Koch Deposition, at 20.)

The apartments were built and designed for adults. (Ogle Deposition, Ct.Rec. 51, at 30.) The actual structure and architectural design of the Roost Apartments is not always safe or amenable to small children. (Defendants' Statement of Facts, Ct.Rec. 51, at 2.) The one-bedroom apartments have steep stairways and three foot banisters surrounding a bedroom located in the loft upstairs. (Bircher Deposition, Ct.Rec. 46, at 45–46, 61.) There is an approximate ten-foot drop from the upstairs loft to the main floor level below. (*Id.* at 56.) It was manager Bircher's practice to point out the "possible dangers" the loft-style apartment structure posed to children, including falling from the upstairs loft and, in case of fire, a child would have to make it down the stairs. He left the ultimate decision of whether to rent with the prospective tenant. (Bircher Deposition, Ct. Rec. 46, at 56–61.) While he was manager at the Roost Apartments, no prospective tenants with children (other than Plaintiff) applied. (Bircher Deposition, Ct.Rec. 46, at 57.) Several people declined renting the apartment due to the location of the apartments, as well as the layout of the loft-style apartments. (Defendants' Response, Ct.Rec. 13, at 3; Bircher Deposition, Ct.Rec. 51, at 58–60, 88–89.) Prospective applicants were concerned about the congested traffic areas surrounding the complex. (Bircher Deposition, Ct.Rec. 51, at 58.)

Since Defendant Koch has been manager, no prospective tenants with children have applied for tenancy at the Roost Apartments. (Koch Deposition, Ct.Rec. 51, at 22–23.) Two individuals with children came to look at the apartment, but at the time there were no vacancies and they were not shown an apartment. (Koch Deposition, Ct.Rec. 51, at 126–27.)

### Tenants with Children.

Four children have resided at the Roost Apartments since March 12, 1989.[3] (Ogle's Response to Interrogatory # 5, Ct.Rec. 46.) Resident manager Kurt Alsperger had two children living with him. (Alsperger Affidavit, Ct.Rec. 13, App. 2, at 1.) The first child at the Roost Apartments was Alsperger's son, born July 1986. (Ogle Deposition, Ct. Rec. 46, at 56.) Plaintiff, Barbara Blomgren, and her minor son moved into the Roost Apartments in April 1990. (Barbara Blomgren Declaration, Ct.Rec. 45, at 1.) Another tenant, Donna Borden, moved into the Roost Apartments with her 17 year old son in September 1991. (Donna Borden's Application and Rental Agreement, Ct.Rec. 46.) Since September 1992, Robbie Blomgren has been the only minor child residing at the Roost Apartments. (Barbara Blomgren Declaration, Ct.Rec. 45, at 2.)

### Rules and Regulations Regarding Children.

From 1975 until September 1992, Defendants distributed apartment Rules and Regulations at the Roost Apartment complex which stated: "[n]o children or pets allowed at the Apartments." (Defendants' Response, Ct.Rec. 13, at 2–3.) Defendant Ronald Ogle was aware of the Fair Housing Act amendments prohibiting discrimination against people with children in the spring or summer of 1989. (Ogle Deposition, Ct.Rec. 46, at 42–43.) Defendants claim the rule prohibiting children never was enforced. (Ct.Rec. 13, Affidavits, Apps. 1–6.)

It was the practice for managers to give a copy of the rules to prospective tenants and explain the rule with regard to children was no longer in effect, and further explain they could disregard that rule. (Bircher and Koch Affidavits, Ct.Rec. 13, Apps. 1 and 6.) To the best of his recollection, Mr. Bircher employed this practice with Plaintiff. (Bircher Affidavit, Ct.Rec. 13, App. 1, at 3.)

---

3. During the time Defendant Koch has been manager, there have been several tenants with children living with them as outlined:

    a. Apartment # 9 has a child living there full time.

    b. Apartment # 13 has a child living there full time.

    c. Apartment # 2 has children living there on weekends.

    d. Apartment # 11 has children living there on weekends.

    e. Apartment # 16 has children living there on weekends.

(Koch Affidavit, Ct.Rec. 13, App. 6, at 2.)

Plaintiff does not recall receiving a copy of the rules prohibiting children when she moved into the Roost Apartment complex. (Second Declaration of Barbara Blomgren, Ct.Rec. 16, at 2.) In addition, she does not recall Todd Bircher telling her the rule he allegedly gave her prohibiting children in the complex did not apply. (*Id.*)

**Plaintiff.**

Plaintiff Barbara Blomgren and her son reside in apartment 13, a one-bedroom unit at the Roost Apartments. (Blomgren's Declaration, Ct.Rec. 45, at 1.) Plaintiff's son, Robbie Blomgren, was born January 25, 1983. (Blomgren Declaration, Ct.Rec. 10, at 1.) Plaintiff is divorced from Robbie's father and has legal custody of Robbie. (Blomgren Declaration, Ct.Rec. 45, at 1.)

**Plaintiff's Rental History.**

In April 1990, Plaintiff and her son moved into apartment 13. (Blomgren Declaration, Ct.Rec. 10, at 2; see Apartment Rental Contract,[4] Ct.Rec. 51, Ex. 2, at 2, No. 16; or Ct.Rec. 13, App. 9, at 2, No. 16.) Resident manager Todd Bircher rented Plaintiff the apartment on a six-month lease at $230.00 per month. (Blomgren Declaration, Ct.Rec. 10, at 2; see also Apartment Rental Contract, Ct.Rec. 51, Ex. 2.) Defendant Ogle was aware the apartment had been rented to Plaintiff. (Bircher Deposition, Ct.Rec. 46, at 34.) Defendants knew of Plaintiff's son since the day they rented to her. (Defendants' Response, Ct.Rec. 13, at 2.)

In September of 1991, Plaintiff's lease was renewed on a month-to-month basis at her request. (Ct.Rec. 51, Ex. 13.) In December 1991, the lease was returned to a six-month lease at the insistence of Defendant Koch. (Koch Affidavit, Ct.Rec. 13, App. 6.)

Plaintiff's last six-month lease term commenced in June 1992, at $275 per month, and was set to expire November 30, 1992. (Koch Deposition, Ct.Rec. 46, Ex. 22.) Plaintiff and her son continue to live at the Roost Apartments pursuant to court order (Blomgren Declaration, Ct.Rec. 45, at 2; Ct.Rec. 21.)

**Complaints Regarding Plaintiff's Son.**

**1. The Water Pipe.**

In the summer of "1991" [sic], when Robbie was seven years old, he filled a five-foot water pipe with rocks. (Blomgren Declaration, Ct.Rec. 10, at 2; Affidavit of Ron Ogle, Ct.Rec. 13, App. 5, at 2.) Defendant Ogle and resident manager Todd Bircher removed the rocks from the pipe. (Ogle Affidavit, Ct.Rec. 13, App. 5, at 2.)

**2. The Broken Slider Door.**

In April 1992, a sliding glass door was broken in apartment 18. (Ct.Rec. 46, Koch Deposition, at 80–81; Ogle Deposition, at 82–83.) Nick Fletcher, a neighborhood child, allegedly broke the sliding glass door, not Robbie Blomgren. (Blomgren Declaration, Ct.Rec. 45, at 3.)

The tenant in apartment 18, Bruce Haidle, complained that Plaintiff's son and some of his friends were having a squirt gun fight, running through the bushes, getting rambunctious, and playing like "little wild Indians." (Ogle Deposition, Ct.Rec. 46, at 84; see also Ogle's Answer to Interrogatory # 9,

4. The rental lease at paragraph 16 provides:
   The resident hereby agrees to accept and abide by the following rules and regulations:
   a. Children shall not play in the public halls, stairways, utility wash rooms or in the storage area.
   b. No ... bicycles, wagons or other wheeled items shall be allowed in halls, passageways, areas or courts of the building....

   g. Nothing shall be thrown by the residents, their servants, employees or visitors from the windows or doors or in the passageways or hallways or courts.

   m. No loud talking or unnecessary noise on the premises.... Radios, televisions, hi fi's and stereos will be turned down to a degree not bothering other residents.
   n. Resident shall see that the conduct of himself, his family and his guests is never disorderly, boisterous or unlawful; that it does not disturb or interfere with the rights, comforts, or convenience of other persons on or around the premises....

Ct.Rec. 51, Ex. 12.) Tenant Haidle left and when he returned, the slider was broke. (*Id.*)

After this incident, Defendant Ogle gave Plaintiff a verbal warning, stating this kind of behavior would have to stop or she would have to find another place to live. (Ogle Deposition, Ct.Rec. 46, at 84–85.)

### 3. Denting the Siding With His Bike.

On or about May 1, 1992, Plaintiff wrote a letter [5] to Defendant Koch advising it was inconceivable that her son had dented the siding of the building with his bike. (Blomgren Declaration, Ct.Rec. 10, at 3.) In May, Plaintiff's lease was renewed. (Koch Deposition, Ct.Rec. 46, Ex. 22.)

### 4. Climbing on the Roost Sign and Throwing.

Sometime between the renewal of Plaintiff's lease and July 6, Robbie was seen climbing on the Roost Apartments sign and throwing items at cars. (Blomgren Declaration, Ct.Rec. 10, at 6; Blomgren Declaration, Ct.Rec. 45, at 3.) Plaintiff claims Robbie threw pine cones across the street to his friends on one occasion. (Blomgren Declaration, Ct.Rec. 10, at 6; see Plaintiff's Reply, Ct.Rec. 15, at 6–7.) Plaintiff saw it and stopped it. (*Id.*) Defendant Koch claims that while she has been manager, she has witnessed Robbie and his friends standing on the same side of the road, throwing items into the street. (Koch Affidavit, Ct.Rec. 13, at 3.)

An incident involving the sign also is referenced in tenant Donna Borden's undated complaint letter.[6] Plaintiff believes this is the same incident which happened before July 6, 1992. (Blomgren Declaration, Ct. Rec. 45, at 3.)

### 5. Noise and Cap Popping Incident.

Defendants contend numerous verbal warnings were given to Plaintiff regarding her son's behavior. (Koch Affidavit, Ct.Rec. 13, App. 6, at 3.)

Sometime between late May and early July 1992, Robbie and his friend were shooting off caps on the patio of the tenant in apartment 18, disturbing a sleeping tenant in the afternoon. (Blomgren Declaration, Ct.Rec. 45, at 2.) Defendant Koch contacted Plaintiff by phone regarding this incident. (Blomgren Declaration, Ct.Rec. 10, at 3.) Plaintiff told her son not to pop off caps. (Blomgren Declaration, Ct.Rec. 45, at 2.)

Plaintiff claims Defendant Koch told her because of this incident, she would have to move. (Blomgren Declaration, Ct.Rec. 10, at 3.) Defendant Koch claims when she approached Plaintiff about the cap-popping incident she only gave a warning, saying if this kind of behavior continued, they may have to look for some place else to live. (Koch Affidavit, Ct.Rec. 13, App. 6.)

Plaintiff called Defendant Ronald Ogle and told him she was not going to move. (Plaintiff's Memorandum, Ct.Rec. 9, at 2.) Defendant Ogle said Robbie could play in the backyard away from the units. (Blomgren

---

**5.** The letter from Plaintiff to Defendant Koch, dated May 1, 1992, states:

> I would say that you're reaching pretty far trying to blame the dent in the siding on my son. I've ridden a bike for over 20 years, and I know I couldn't balance my bike on that beam without killing myself. Looks more to me like a big truck (Cox Cable perhaps) dented the siding and took out a piece of the post at the same time. But I'm sure now that the boys had a problem with the window (adults don't make mistakes or have accidents) everything that goes wrong in the apartments will be blamed on Robbie.
>
> Robbie is not suppose to have company when I'm not here, but he's been reprimanded for breaking the rules. Frankly, that's not any

of your or Ron's business to tell me whether you like him being home alone or not.

> I don't like living here any more than you like us being here, but that's the breaks.

(Defendants' Response, Ct.Rec. 13, App. 14.)

**6.** Donna Borden, unit # 9, complained by undated correspondence, stating:

> We have been disturbed several times by the boy in Apartment # 13. He has been on our patio several times with his friends—playing in the shrubs and the last time he was standing on the top of the "Roost Apartment Sign" which is right below our bedroom talking loudly with his friend and throwing things at the cars. I hope you can resolve the situation.

(Ct.Rec. 10, App. 5.)

Declaration, Ct.Rec. 10, at 3; Ogle Deposition, Ct.Rec. 46, at 97.)

In 1991, Defendants Ogle purchased a lot behind the Roost Apartments to "make a place for people to do things, play with children, parking and some garages." (Ogle Deposition, Ct.Rec. 46, at 96–97.) The lot has not been developed. (*Id.;* Blomgren Declaration, Ct.Rec. 45, at 4.) The lot is fenced, but the fence does not completely enclose the lot. (Defendants' Response, Ct.Rec. 13, at 10.) The lot can be accessed by walking around the fence. (*Id.*)

Defendants Ogle have an easement through a neighbor's property to access the fenced-in lot. (Ogle Deposition, Ct.Rec. 46, at 97–98.) Defendant Ogle, however, did not inform Plaintiff of the easement or how the children could access the lot through the neighbor's property; nor did Defendant make arrangements for the children to access the lot. (*Id.* at 98–99.)

Defendant Koch did not know what arrangements Defendant Ronald Ogle made for the children to play in the backyard. (Koch Deposition, Ct.Rec. 46, at 104.) Plaintiff complained about the lack of access to the back lot before she received the July 6, 1992, eviction letter. (Facts Relied Upon By Plaintiff, Ct.Rec. 46, at 13.)

### 6. Motorcycles.

On at least two occasions during the time Defendant Koch has been manager, she has seen Robbie and his friends playing with the motorcycles, playing under the motorcycle covers, etc., and asked them to stop. (Koch Affidavit, Ct.Rec. 13, at 2–3; see also Defendant Koch's letter to Plaintiff's Attorney, Ct.Rec. 10, App. 3.)

### 7. Check Incident.

On the July 4th weekend, Robbie, his friend Nick and Donna Borden's grandson were involved in stealing mail from the apartment complex next door to the Roost Apartments and trying to cash a check at the mall. (Blomgren Declaration, Ct.Rec. 10, at 6–7; Blomgren Declaration, Ct.Rec. 45, at 4.) Plaintiff claims Donna Borden's grandson stole the check and tried to cash it. (*Id.*) The police were called and talked to the two boys. (*Id.*) No charges were filed. (*Id.*) The boys returned the mail, apologized and paid for stamps for letters that needed to be resent. (*Id.*)

### 8. Bikes on Walkway.

Tenant Dale Zinkgraff complained of noise and of Robbie and his friends leaving their bikes on the walkway.[7] (Complaint letter, Ct.Rec. 10, App. 4.) Defendant Koch told the children several times not to ride their bikes on the lawn. (Letter to attorney Mueller, Ct.Rec. 10, App. 3.) Defendant Koch never saw Robbie's bike parked in the entryway while she was manager at the Roost Apartment complex. (Koch Deposition, Ct.Rec. 46, at 100.)

### 9. Observation of Robbie Left Home Alone.

Robbie was left unsupervised on numerous occasions. (Koch Affidavit, Ct.Rec. 13, App. 6.) When Plaintiff was confronted as to Robbie's supervision, she stated she could not afford a babysitter. (Defendants' Response, Ct.Rec. 13, at 6; see also Plaintiff's Letter of May 1, 1992, Ct.Rec. 13, App. 14.) Plaintiff claims she has a friend who watches the children when she is not at home. (Declaration of Robert Fletcher, Ct.Rec. 17.)

### 10. Dumpster and "409" Incident.

On or about August 17, 1992, tenant Kristen Butzlaff gave Defendant Koch a written complaint about Robbie climbing on the dumpster, banging on it, and squirting "409".[8] (Ct.Rec. 10, App. 6.) Robbie filled a

---

7. Dale Zinkgraff, unit # 12, complained by undated correspondence, stating "[t]here is a child that lives next door he is kind of noisy. [sic] Sometime [sic] him [sic] and his friends leave there [sic] bikes in the walk way or play buy [sic] the cars in the parking area." (Ct.Rec. 10, App. 4.)

8. The complaint by Kristen Butzlaff, unit # 14, dated 8/17/92, stated:

I thought you should be made aware of a few problems my neighbors in apartment # 13 are causing.

First of all, a few weeks ago the boy was climbing on the dumpster, banging on it,

"409" bottle with water and squirted spiders around the complex. (Blomgren Declaration, Ct.Rec. 10, at 8.) Former manager Todd Bircher recalls having problems with Robbie crawling in the dumpster numerous times while he was manager. (Bircher Deposition, Ct.Rec. 51, at 65.) Defendant Koch asked Ms. Butzlaff to write this letter after Ms. Butzlaff complained to Defendant Koch orally. (Koch Deposition, Ct.Rec. 46, at 91.)

Defendant Koch believes she received the complaint letters from Donna Borden and Dale Zinkgraff before she wrote the July 6, 1992, letter, requesting Plaintiff vacate by August 31, 1992. (Koch Deposition, Ct.Rec. 46, at 88–89.) Plaintiff alleges Tenant Dale Zinkgraff told her Defendant Koch put pressure on him to write his letter. (Blomgren Declaration, Ct.Rec. 10, at 7.) Defendant Ogle suggests the conduct described in Borden's and Zinkgraff's letters occurred in August 1992. (Ogle's Answers to Interrogatory # 9, Ct.Rec. 46.)

**Process of Eviction.**

On or about July 6, 1992, Defendant Koch posted a letter on Plaintiff's door requesting

> throwing rocks and squirting "409" on the roof and the outside of your window. This actually happened a couple of times and on one of the latter occasions I said something to him. I also noticed that his mother was home too.
> At times they also tend to be a bit noisy. The TV or radio is on loud late at night and they run up and down the stairs loud enough for me to hear.
> (Ct.Rec. 10, App. 6.)

9. The posted letter stated:

> Due to past problems such as the broken glass door, complaints from other tenants of being disturbed and the recent complaints of your son and his friends climbing on the sign located in the front yard facing Broadway and throwing rock or other items at passing cars, since Ron had made arrangements for the children to play in the backyard away form [sic] the living quarters to prevent any further complaints and his request was not granted he does not want to liable [sic] for anyone getting hurt and feels it best for you and your son to find another place to live. He is giving you until August 31, 1992 to find a new residence, he also wants me to relay he is sorry this didn't work out and if you have any questions please feel free to call him at (509) 238–6647, he will be out of town until July 8, 1992.
> (Blomgren Declaration, Ct.Rec. 10, App. 2.)

Plaintiff vacate the apartment by August 31, 1992, because of her son's behavior.[9] (Blomgren Declaration, Ct.Rec. 10, at 4.) In the letter, Defendant Koch cited "past problems" and the failure of Plaintiff's son to play in the backyard away from the living quarters after Mr. Ogle had made arrangements for them to do so. (Plaintiff's Memorandum, Ct.Rec. 9, at 2.)

Plaintiff contacted Spokane Legal Services Center about the eviction notice. (Blomgren Declaration, Ct.Rec. 10, at 4.) Plaintiff's attorney contacted Defendant Koch. (*Id.*) On August 31, 1992, Defendant Koch sent a letter[10] and the three written complaints from tenants to Plaintiff's attorney. (Plaintiff's Memorandum, Ct.Rec. 9, at 6; Ct.Rec. 10, App. 3–6.) Plaintiff did not vacate the apartment by August 31, 1992. (Blomgren Declaration, Ct.Rec. 10, at 4.) Plaintiff paid September's rent and the manager accepted it. (*Id.*)

In September 1992, Plaintiff left a message on Defendant Koch's answering machine regarding the letter Koch had sent to Plaintiff's attorney.[11]

10. In her August 31, 1992, letter to attorney Mueller, Defendant Koch stated:

> This is in response to the letter you sent me on August 25, 1992 regarding the complaints of Ms. Blomgren's tenancy. I have enclosed copies of the complaints and her lease. I have also witnessed her son throwing items at passing cars from the property and he and his friends playing on and around another tenants [sic] motorcycles (which are always covered) I approached the children and have told them several times not to play around the vehicles. I also told them several times not to ride their bikes on the lawn. There is another situation you may need to know, Ms. Blomgren's son and his friends were caught stealing checks from the outgoing mail boxes at the apartments next door, this took place around the 1st of July 1992.
> If you have any questions please feel free to call me at 926–8863.
> (Ct.Rec. 10, App. 3.)

11. The message transcribed as follows:

> (Beep)
> Boy Shannon, you're really earning your money this month. Wow.
> (Beep)
> You know, one other thing Shannon, you ought to get your stuff straight before you start, you know, with the accusations. Um, that little

On or about September 15, 1992, Defendant Koch sent Plaintiff a letter stating her lease would end October 31, 1992, and would not be renewed due to rule violations and complaints from other tenants.[12] (Blomgren Declaration, Ct.Rec. 10, at 4.) On or about September 17, 1992, Defendant sent a second letter indicating the correct expiration date of the lease was November 30, 1992.[13] (*Id.*)

In September 1992, Defendant Koch revised the rule prohibiting children to read "[n]o children (other than visiting) or pets allowed in the apartments." (Blomgren Declaration, Ct.Rec. 10, App. 9.)[14] On or about September 17, 1992, Defendant Koch distributed the revised rules to tenants who were home. (Koch Affidavit, Ct.Rec. 51, Ex. 5, at 4.)

A letter, together with a list of "Rules and Regulations for Apartment Tenants" was posted on the doors of all the apartments in the complex, except Plaintiff's. (Blomgren Declaration, Ct.Rec. 10, at 4.) Plaintiff took a copy of the documents off her neighbor's door. (*Id.*) Defendants aver this rule has never been applied, nor enforced, and was never given to Plaintiff. (Koch Affidavit, Ct.Rec. 13, App. 6.)

Defendants aver these rules were posted because of the addition of new rule No. 13 dealing with garbage and mail; it was not for the restriction of children. (Defendants' Statement of Facts, Ct.Rec. 51, at 3.; Koch Affidavit, Ct.Rec. 13, App. 6; see Revised Rules, Ct.Rec. 13, App. 8; Ct.Rec. 51, Ex. 5.)

In addition to making rule No. 13, Defendant Koch modified rule No. 3 to include a sentence regarding smoking.[15] (Blomgren Declaration, Ct.Rec. 10, App. 9.) Koch claims she did not delete the reference to "no children" because she was not advised to delete it. (Koch Deposition, Ct.Rec. 51, at 48.) Defendant Koch was aware it was illegal to discriminate against families with children in renting apartments. (*Id.*) At the time these revised rules were distributed, Robbie Blomgren was the only minor child living at the Roost. (Plaintiff's Reply, Ct. Rec. 52, at 14.)

Defendant Ogle was unaware Defendant Koch was distributing the revised rules to tenants at the Roost Apartment complex in September 1992. (Ogle Deposition, Ct.Rec. 46, at 65.) Defendant Ogle was unhappy with the modification and claims he would have corrected the rules to reflect the present law regarding children. (*Id.* at 65–68.)

Defendant Koch distributed the revised rules (September 1992 rules) to a new tenant who moved into the complex on or about October 3, 1992. (Koch Deposition, Ct.Rec. 46, at 59–62.) Plaintiff filed suit on October 8, 1992. (Ct.Rec. 1.)

On November 5, 1992, Defendant Koch gave Plaintiff a lease renewal form indicating renewal of the lease on a month-to-month

---

grandson of the lady in apartment nine is the one who is ... tried to cash the stolen check. It wasn't Robbie and his friends. It was Robbie and her grandson and he's the one that did the dirty work so leave my Robbie alone you stupid bitch.
(Affidavit of Sharon Hannie, Ct.Rec. 13, App. 13.)

**12.** In her letter sent on or about September 15, 1992, Defendant Koch stated:

Per Ron Ogle's request I have been asked to notify you when you [sic] lease expires as of October 31, 1992 it will not be renewed. Mr. Ogle feels since several complaints have been made and the rules of the complex have not been kept it is best not to renew your lease.
Please put in writing the date prior to November 1, 1992 you will be vacating the premises and return to Ron or myself as soon as possible. If you have any questions you may contact Ron at (509) 238-6647.

(Ct.Rec. 10, App. 7.)

**13.** In her letter sent on or about September 17, 1992, Defendant Koch stated:

You are correct I miss calculated [sic] when your lease expires. It does expire on November 30, 1992 as the other letter stated Ron will no longer renew your lease please let us know in writing when you will be vacating prior to December 1, 1992.
(Ct.Rec. 10, App. 8.)

**14.** Rule No. 3 reads "[n]o children (other than visiting) or pets allowed in the apartments. All apartments are non smoking if you choose to smoke your rent will be raised $50.00 per month."

**15.** Rule No. 3 reads "[n]o children (other than visiting) or pets allowed in the apartments. All apartments are non smoking if you choose to smoke your rent will be raised $50.00 per month."

basis at $300.00 per month. (Blomgren Declaration, Ct.Rec. 10, at 8; see renewal notice, Ct.Rec. 10, App. 10; Defendants' Memorandum, Ct.Rec. 50, at 3.) On the advice of her counsel, Plaintiff did not sign the lease (Defendants' Memorandum, Ct.Rec. 50, at 3.) Instead, Plaintiff tendered a check for December's rent. (Defendants' Memorandum, Ct.Rec. 50, at 3.) Defendants returned Plaintiff's check with a letter stating they no longer acknowledged Plaintiff as a tenant at the Roost Apartments.[16] (Second Blomgren Declaration, Ct.Rec. 16, at 1.)

The List of Rules and Regulations containing the offending clause was amended a second time after the commencement of this action. (Defendants' Statement of Facts, Ct. Rec. 51, at 4; Ogle Affidavit, Ct.Rec. 51, Ex. 10; and Amended List of Rules and Regulations, Ct.Rec. 51, Ex. 11.) The provision regarding children has been omitted from the regulations. (Defendants' Response, Ct. Rec. 13, at 3; see also Ct.Rec. 13, App. 7.)

In addition, Defendants returned to all renters who received a copy of the rules which were posted on their doors in September 1992 and confirmed that these tenants understood that rule was not applicable. The tenants also signed that they had received the new rules, which did not include the "no children" clause. (Defendants' Response, Ct.Rec. 13, at 3.)

On November 20, 1992, Plaintiff filed a motion for a preliminary injunction seeking to enjoin Defendants from evicting Plaintiff or terminating her tenancy pending final disposition of her complaint or order of the court. (Ct.Rec. 7.)

In November 1992, there was an additional complaint by tenant Mike Alsperger that Robbie and his friends were noisy. (Ogle's Answer to Interrogatory # 9, Ct.Rec. 46, No. 8.)

The court granted the preliminary injunction on December 21, 1992, contingent upon Plaintiff and her son conforming to the rules of the apartment and keeping her rent current. (Ct.Rec. 21.)

On December 31, 1992, Defendant Koch found Robbie Blomgren and a friend playing in the storage area in violation of apartment rules. (Ogle's Answer to Interrogatory # 9, No. 9, Ct.Rec. 46; Koch Deposition, Ct.Rec. 51, at 132–33.) Apparently Robbie had been locked out of his apartment. (*Id.*) Defendant Koch let Robbie into his apartment and called a children's agency. (*Id.* at 133.)

On January 5, 1993, tenant Bruce Haidle, apartment 18, complained of Robbie and his friends having a snowball fight and breaking a fence. (Koch Deposition, Ct.Rec. 51, at 109–10.) The fence was repaired by Plaintiff. (*Id.* at 110.)

## SUMMARY JUDGMENT STANDARDS

■ A party is entitled to summary judgment where the documentary evidence in the file permits only one factual conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, this court must determine if a fair-minded jury could return a verdict for the non-moving party. *Id.* at 252, 106 S.Ct. at 2512. The party seeking summary judgment must show that no genuine issue of material fact exists and that she is entitled to judgment as a matter of law by showing there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ If the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All inferences drawn from the underlying facts must be viewed in a light most favorable to the non-moving party. *Id.*

## ELEMENTS

In 1973, the Supreme Court established a three-part burden of proof test for cases

---

**16.** The letter from Defendants to Plaintiff stated "Ron Ogle and I were advised by our council [sic] since we have chosen not to renew your lease, we no longer acknowledge you as a tenant of The Roost Apartments at 8910 E. Broadway # 13, Spokane, WA. Therefore, we are returning your check." (Ct.Rec. 16, App. 1.)

alleging discriminatory treatment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* analysis has been widely applied to Fair Housing claims. *See also Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir.1984), *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979), *Alogaili v. National Housing Corp.*, 743 F.Supp. 1264 (N.D.Ohio 1990), and *A.F.A.P.S. v. Regulations & Permits Admin.*, 740 F.Supp. 95 (D.P.R.1990).

■ First, Plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff sufficiently establishes a prima facie case, the burden shifts to the defendant to produce evidence that the refusal to rent or negotiate for a rental was motivated by legitimate, nondiscriminatory considerations. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, at 254–55, 101 S.Ct. 1089, at 1095, 67 L.Ed.2d 207. Third, if the defendant satisfies this burden, the plaintiff must prove by a preponderance of the evidence that the reasons asserted by the defendant are in fact pretextual. *McDonnell Douglas*, 411 U.S. at 802, 804, 93 S.Ct. at 1824, 1825. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. See *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 295 n. 2, 58 L.Ed.2d 216 (1978); *Id.* at 29, 99 S.Ct. at 297 (Stevens, J., dissenting).

## SECTION 3604(a)

The Fair Housing Act makes it illegal to refuse to rent a dwelling to any person because of familial status. 42 U.S.C. § 3604(a). Plaintiff claims Defendants refused to renew her lease on September 15, 1992, because she had a minor child, alleging Defendants' decision was an attempt to get rid of the only child living at the Roost Apartments.

During oral arguments, counsel for Defendants conceded Plaintiff has fulfilled the first prong of the *McDonnell Douglas* test. She has shown by a preponderance of the evidence a prima facie case of discrimination. She is in a protected class of persons based on her familial status, and Defendants refused to renew her lease for reasons related to Plaintiff's minor child.

■ Defendants, however, contend Plaintiff's and her son's noncompliance with the apartment rules[17] (except the void rule three) was the reason for their decision not to renew her lease and Plaintiff's familial status played no part in their decision. Defendants claim the following additional reasons for their decision: (a) Defendants fear losing good tenants in the future because of the behavior of Plaintiff and her son; (b) property was damaged (slider door) which had to be fixed at Defendants' expense;[18] (c) Defendants fear liability from the tenants' behavior of throwing rocks and other items in the street and at cars; (d) Plaintiff leaves her son alone without supervision,[19] which

17. The rental lease at paragraph 16 provides:
The resident hereby agrees to accept and abide by the following rules and regulations:
a. Children shall not play in the public halls, stairways, utility wash rooms or in the storage area.
b. No ... bicycles, wagons or other wheeled items shall be allowed in halls, passageways, areas or courts of the building....

g. Nothing shall be thrown by the residents, their servants, employees or visitors from the windows or doors or in the passageways or hallways or courts.

m. No loud talking or unnecessary noise on the premises ... Radios, televisions, hi fi's and stereos will be turned down to a degree not bothering other residents.

n. Resident shall see that the conduct of himself, his family and his guests is never disorderly, boisterous or unlawful; that it does not disturb or interfere with the rights, comforts, or convenience of other persons on or around the premises....

18. Defendants claim Plaintiff did not apologize for the inconvenience and expense. Deposition Testimony of Ronald Ogle, at page 85 (Ct.Rec. 46), indicates Plaintiff did apologize.

19. Plaintiff argues Defendants' accusations that Plaintiff left her eight/nine-year old son alone, unsupervised is irrelevant as this is not a "written rule" violation. All should be sympathetic to the unfortunate fact of life, indeed the national shame, that safe, affordable child care, sadly, is not available for many who need it. Yet, it also must be noted that, as a matter of law, landown-

has caused trouble for the manager and owner; (e) the situation has caused a lot of stress for the manager and the owner; (f) Defendants claim they tried to solve this condition peacefully with no results, and it is now time for Plaintiff's family to find another place to rent. (*See* Ronald Ogle's Response to Interrogatory #10, Ct.Rec. 46.)

Although Plaintiff has established a prima facie case under § 3604(a), material factual issues of whether Defendants refused to renew Plaintiff's lease because her child's behavior was unreasonably disruptive to the tenants and property at the Roost Apartment complex, remain in dispute within the meaning of Rule 56, Fed.R.Civ.P. Plaintiff's Motion for Summary Judgment on the issue of Defendants' liability and a declaration stating Defendants violated 42 U.S.C. § 3604(a), therefore, must be DENIED.

### SECTION 3604(b)

█ The Fair Housing Act makes it illegal to discriminate against any person in the terms, conditions or privileges of the rental of a dwelling. 42 U.S.C. § 3604(b). Plaintiff claims Defendants tried to evict her on July 6, 1992, because she had a child. She claims their discriminatory intent is evidenced by the fact they handled complaints about her son differently than complaints about an adult tenant.

The stated policy at the Roost Apartments, found in rule No. 11 of the "Rules and Regulations for Apartment Tenants," provides "[a]ny parties or whatever, that we get complaints on will be handled by one verbal warning from the manager or owner. At the second complaint, you will be given notice to move out." (Ogle's Response to Interrogatory #9, Ct.Rec. 51, Ex. 12.)

Apparently, an adult tenant was invited to renew her lease in February 1993, after two written complaints regarding noise. In the letter Plaintiff received on July 6, 1992, Defendants requested she find other housing by August 31, 1992. Prior to July 6, 1992, Plaintiff had received at least two verbal warnings regarding her son's behavior,[20] (*i.e.,* the glass slider door incident and the cap popping incident). Plaintiff claims this is differential treatment and direct evidence of a violation of 42 U.S.C. § 3604(b). *Khawaja v. Wyatt,* 494 F.Supp. 302, 303 (W.D.N.Y. 1980) (plaintiff claimed he was targeted for enforcement of an existing lease agreement).

Defendants assert this tenant, unlike Plaintiff, heeded Defendant Koch's warnings and the problems ceased. (Koch Deposition, Ct.Rec. 51, at 123.) Defendants claim this illustrates Defendants were not rigid in the application of their stated policy and provided all tenants the opportunity to comply with rules before either eviction or non-renewal of their lease. (Defendants' Memorandum, Ct. Rec. 50, at 11.)

Viewing the evidence, as this court is required, in the light most favorable to the non-moving Defendants, it is concluded material questions of fact exist as to whether the rental terms concerning complaints and warnings were applied by Defendants in a discriminatory manner. Plaintiff's Motion for Summary Judgment on the issue of Defendants' liability and a declaration stating

---

ers have legitimate concerns about the supervision of their tenants' children. A parent's failure to supervise a child impacts the rights of the landowner in cases of liability causing acts. More importantly, consider for example, the possible tragic consequences to the child who might be trapped in a fire because no adult is close enough to lead the child to safety.

Common sense also dictates parents are responsible for supervising the activities of their young children without the need of a written rule. Just as one who enters a national forest does not require a written rule stating it is unlawful to start a forest fire or one entering the Redwood forest does not require a written rule about cutting the old growth, neither does a parent need to be instructed by apartment rules not to leave a young child unsupervised. In this

regard, see *Courville v. Town of Barre, Massachusetts,* 818 F.Supp. 23 (D.Mass.1993) (landowners "can have concerns about particular children's behavior or particular parents' inability to control such behavior without being guilty of discrimination based on familial status so long as there is some standard of reasonableness (*i.e.,* a recognition that there are no perfect children or perfect parental control)."

20. Plaintiff claims the allegations against her son are merely pretextual. She claims either the complaints regarding her son occurred prior to renewal of her lease in May and after the July 6, 1992, eviction letter; or there was no legitimate basis for the complaints, or her son engaged in typical behavior of a child his age.

Defendants violated 42 U.S.C. § 3604(b), therefore, must be DENIED.

### SECTION 3604(c)

Section 3604(c) prohibits the printing or publishing of any notice or statement indicating any preference, limitation or discrimination based on familial status. 42 U.S.C. § 3604(c). The § 3604(c) prohibition applies "to all written or oral statements by a person engaged in the sale or rental of a dwelling." 24 C.F.R. § 100.75(b) (1992).

Case law construing § 3604(c) is relatively limited. Much of the analysis under § 3604(c) deals with commercial advertising practices which discriminate on the basis of race.[21] *See United States v. Hunter,* 459 F.2d 205 (4th Cir.1972), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972) (phrase "white home" held to indicate a racial preference); *Ragin v. New York Times Co.,* 923 F.2d 995 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991) (exclusive use of models of one race may violate § 3604(c)); *Housing Opportunities Made Equal v. Cincinnati Enquirer,* 943 F.2d 644, 648, 650 (6th Cir.1991) (a discriminatory message must stem from a "notice, statement or advertisement" that indicates a racial preference; a single advertisement featuring a select number of white models does not, as a matter of law, state a cause of action pursuant to § 3604(c)); *Fenwick–Schafer v. Sterling Homes Corp.,* 774 F.Supp. 361, 366 (D.Md.1991) (impact of all-white advertising on "ordinary reader" is a question for the jury); *Saunders v. General Services Corp.,* 659 F.Supp. 1042, 1057–59 (E.D.Va. 1987) (defendants demonstrated discriminatory intent in various parts of their business, *i.e.,* instructed agents to treat black tenants and prospective black tenants less favorably than others).

■ In commercial advertising, a cognizable claim under § 3604(c) may be established when (a) an ad communicates in an obvious and undeniable way a discriminatory preference; or (b) the ad is rendered discriminatory through the proof of extrinsic circumstances demonstrating discriminatory intent. *Housing Opportunities Made Equal v. Cincinnati Enquirer,* 731 F.Supp. 801, 804 (S.D.Ohio, 1990), *aff'd* 943 F.2d 644 (6th Cir. 1991). An example of obvious discriminatory preference in advertising is found in the *Hunter* case where defendant published a classified advertisement for a "private white home."

A violation of § 3604(c) in advertising also has been proved by looking at the "totality of the evidence." *Housing Opportunities,* 731 F.Supp. at 804. In *Saunders v. General Services Corp.,* 659 F.Supp. 1042 (E.D.Va. 1987) the record was replete with extrinsic evidence of defendant's discriminatory intent. The court, however, noted a plaintiff need not demonstrate intent to prove a § 3604(c) violation. *Id.* at 1058.

The relevant standard applied in the advertising cases has been the natural interpretation of the ordinary reader. *United States v. Hunter,* 459 F.2d at 215; *see also Spann v. Colonial Village, Inc.,* 899 F.2d 24 (1990), and *Ragin v. New York Times Co.,* 923 F.2d 995, (2d Cir.) *cert. denied,* —— U.S. ——, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991). Section 3604(c) is violated "if an ad for housing suggests to an ordinary reader that a particular race is preferred or dispreferred for the housing in question." *Ragin,* at 999 (adopting standard set forth in *United States v. Hunter,* 459 F.2d at 213–14). The ordinary reader "is neither the most suspicious nor the most insensitive of our citizenry." *Ragin,* at 1002.

■ According to the *Ragin* court, proof of an advertiser's intent may be relevant to determining the message conveyed; but "the

---

**21.** Other cases dealing with § 3604(c) involved the recording of deeds are *Mayer v. Ridley,* 465 F.2d 630, 650 (D.C.Cir.1972) (held § 3604(c) prohibits recorder of deeds from accepting for filing instruments that contain racially restrictive covenants); *Woodward v. Bowers,* 630 F.Supp. 1205, 1208 (M.D.Pa.1986) (mere act of accepting for recording a deed is not a publication within the meaning of § 3604(c)). Cases dealing with discriminatory oral statements are *United States v. L & H Land Corp., Inc.,* 407 F.Supp. 576, 580 (S.D.Fla.1976) (oral statements that no black persons were permitted); *Stewart v. Furton,* 774 F.2d 706 (6th Cir.1985) (chain of events including statements that blacks were not allowed coupled with race-conscious refusal to rent rendered defendants liable for damages under § 3604(c)).

touchstone is nevertheless the message." *Id.* at 1000. In essence, § 3604(c) prohibits all publications which indicate a discriminatory preference to an ordinary reader whatever the advertiser's intent. *Id.; see also United States v. University Oakes Civic Club*, 653 F.Supp. 1469 (S.D.Tx.1987), citing *United States v. Pelzer Realty Co.*, 484 F.2d 438 (5th Cir.1973).

■ In cases where advertisements are clearly discriminatory, a court may look at an ad and determine whether it indicates an impermissible preference to an ordinary reader, and inquiry into the author's professed intent is largely unnecessary. *Soules v. U.S. Department of Housing and Urban Dev.*, 967 F.2d 817, 824 (2d Cir.1992).

Proof that defendants violated the Fair Housing Act can be found if to a "reasonable reader the natural interpretation of Defendants' advertisements ... is that they indicate a racial preference" or an intention to make such a preference. *See Saunders*, 659 F.Supp. at 1058.

In *United States v. Lepore*, 816 F.Supp. 1011 (M.D.Pa.1991), the court determined that by including in a mobile home park's printed rules and regulations a provision unreasonably limiting occupancy in a mobile home to two persons, defendants made, printed or published a notice or statement indicating a limitation or discrimination based on familial status. *Id.* at 1024. In *Lepore*, the parties also presented substantial direct evidence that defendants made oral statements they did not want children living in the park, clearly demonstrating intent to discriminate against families with children.

■ Plaintiff Blomgren has presented evidence of documents which are discriminatory on their face. Defendants readily admit the documents were distributed. Defendants contend, however, the document containing the provision, "[n]o children or pets allowed in the apartments," was printed long before the 1988 Amendments to the Fair Housing Act went into effect and has not been en-

forced at the Roost Apartments since 1986. Defendants claim tenants were advised this provision was void, although Defendants took no steps to delete the provision by marking through it or by revising the rules. Plaintiff Blomgren does not recall receiving these rules or being instructed as to their inapplicability.

In September 1992, the rules were revised to read, "[n]o children (other than visiting) or pets allowed in the apartments." Defendant Koch claims she was not advised to delete the provision regarding children, although she took it upon herself to modify it. Defendant Ogle claims he was unaware of the revisions until after they were distributed and would have modified the offending rule to conform to current laws prohibiting discrimination against families with children.

To summarize, with § 3604(c), a violation occurs under *Cincinnati Inquirer* and its progeny when the communication implies an obvious discriminatory preference. Alternatively, intent to discriminate also need not be proved to establish violation where the ordinary reasonable reader infers the particular discriminatory preference, under *New York Times Co.* and its progeny. Under either of these standards, as a matter of law, distribution of both the original "no children" provision and the September 1992 "no children" revision were violations of § 3604(c).

■ Damages, however, may be imposed only where there is credible proof of harm proximately caused by the violation. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), Plaintiff ultimately must prove Defendants' illegal actions actually caused her to suffer injuries within the meaning of the statute before she will be entitled to a damages remedy.[22] *Id.* at 379 n. 21, 102 S.Ct. at 1125 n. 21. To this end, while inquiry into Defendant's intent is unnecessary as to the violation, convincing non-discriminatory motive will be relevant for consideration by the

---

22. For purposes of her Motion, Plaintiff claims she was upset by the rules she removed from her neighbor's door two days after Plaintiff was informed her lease would not be renewed. Not before the court is the question of whether this

type of harm, standing alone, is sufficient, within the meaning of the statute, to establish actual injury or causation for purposes of a damages remedy.

factfinder as to Plaintiff's damages, if any, and causation. Conversely, the finder of fact may consider the *per se* unlawful notices as relevant to the issue of Defendants' intent as to the §§ 3604(a) and (b) claims.

## CONCLUSION

The trier of fact, not the court, must determine whether the evidence offered by the parties is credible and whether Plaintiff has shown by a preponderance of the evidence that familial relationship played a motivating role in Defendants' treatment of Plaintiff and her son. *Alogaili,* 743 F.Supp. at 1270. Furthermore, the trier of fact must determine whether defendants' articulated reasons for their actions were true or merely pretextual. *Id.* Accordingly,

**IT IS ORDERED:**

1. Plaintiff's Motion for Summary Judgment (Ct.Rec. 43) regarding liability under 42 U.S.C. §§ 3604(a) and (b) is **DENIED.**

2. Plaintiff's Motion for Summary Judgment (Ct.Rec. 43) regarding a declaration of 42 U.S.C. § 3604(c) violations is **GRANTED.** Defendants committed *per se* violations of 42 U.S.C. § 3604(c) by publishing the original "no children" and the later notice stating "[n]o children (other than visiting) allowed at the apartments."

3. The scheduling order regarding pretrial dates is amended as follows:

   a. **EXHIBIT LIST.** Exhibit lists shall be filed and served and exhibits made available for inspection (or copies provided) on or before **JULY 20, 1993.** Objections to exhibits shall be filed and served on or before **JULY 26, 1993** and shall be heard at the pretrial conference. All exhibits shall be pre-marked: Plaintiff's are to be numbered 1 through 99; Defendants' are to be numbered 100–199.

   b. **DEPOSITIONS.** Relevant, substantive deposition testimony (as distin-guished from impeachment testimony) shall be highlighted by colored marker and served on the opposing party before **JULY 20, 1993.** Cross-designations of relevant deposition testimony shall be highlighted in a different color and served on the opposing party on or before **JULY 26, 1993.** Objections to any designated deposition testimony shall be filed and served on or before **AUGUST 2, 1993.** Those objections will be heard and resolved at the pretrial conference.

   c. **MOTIONS IN LIMINE.** Substantive or evidentiary issues which may foreseeably arise during trial shall be addressed by motions in limine to be served and filed not later than **AUGUST 2, 1993.** Such motions will be addressed and resolved at the pretrial conference.

   d. The **PRETRIAL CONFERENCE** will be held in Spokane, Washington, **AUGUST 13, 1993, at 1:30 p.m.** A proposed pretrial order must be lodged three (3) days prior to the pretrial conference in compliance with LR 12, Local Rules for the Eastern District of Washington. If counsel agree on a pretrial order, counsel need not appear at the pretrial conference unless there are unresolved motions or objections to be heard. If oral argument is necessary, it will be by telephone. The Plaintiff will initiate the call to Judge Imbrogno at **(509) 353–2362.**

   e. **TRIAL.** Requested voir dire questions, proposed jury instructions and trial briefs shall be filed and served no later than **AUGUST 16, 1993.** Jury selection will commence **AUGUST 23, 1993, at 9:00 a.m.,** in Spokane, Washington. Trial will commence immediately thereafter.