2000 UT 30

**MALIBU INVESTMENT COMPANY,**
Plaintiff and Appellee,

v.

**Kathy SPARKS, Defendant
and Appellant.**

No. 980199.

Supreme Court of Utah.

Jan. 31, 2000.

James R. Boud, Troy K. Walker, Sandy, for plaintiff.

Russell A. Cline, Michael Crippen, Salt Lake City, for defendant.

RUSSON, Justice:

¶ 1 Defendant Kathy Sparks appeals from a decision of the trial court granting sum-

mary judgment in favor of plaintiff Malibu Investment Company on Malibu's eviction claim under the Utah Mobile Home Park Residency Act, and denying her own motion for summary judgment under the state and federal fair housing acts.

## BACKGROUND

¶ 2 On July 1, 1994, Kathy Sparks purchased a mobile home located at Malibu's Byde–A–Wyle Haciendas Mobile Home Park (the "Park"). That same day, Sparks entered into a month–to–month agreement with the Park to lease the space on which her mobile home was located. The lease agreement required Sparks to abide by the Park's rules and regulations, which were attached to the lease agreement. She signed a copy of the rules and regulations, acknowledging that she read and understood them.

¶ 3 From the date she signed her lease, Sparks resided at the Park with her two daughters. In December 1996, one of Sparks' daughters gave birth to a baby boy. The Park manager was aware that the child resided in Sparks' mobile home with Sparks and her two daughters.

¶ 4 In March 1997, pursuant to the lease agreement which permitted the adoption of new rules at any time, the Park adopted new rules that were scheduled to take effect in May 1997. Sparks received a copy of the new rules and regulations, and she acknowledges that she read and understood them.

¶ 5 On July 9, 1997, the Park served Sparks with two notices of rules violations—a seven–day notice and a sixty–day notice—both signed by the manager of the Park. Both notices informed Sparks that she was in violation of numerous Park rules related to the repair and maintenance of her mobile home and mobile home space.

¶ 6 The seven–day notice listed fourteen rules violations related to repair and mainte-

nance. After enumerating the specific rules that Sparks allegedly violated, the notice explicitly instructed Sparks to remove nonpatio furniture from her deck, resod the yard, trim a tree that was overgrown onto a neighbor's property, replace a broken back door, remove hard water stains from windows, replace broken windows, replace broken shutters, remove a run–down wooden fence from the back yard, clean and paint an air conditioner, replace a damaged water heater door, replace damaged siding, sweep out a gutter, keep the lawn trimmed, and stop parking a car on the grass. After listing these numerous maintenance violations, the notice also included a provision stating:

> You are violating Rule 7 # 3 because you have more people living in the home than you are registered with. This rule says that no occupation by more than one family without permittion from management [sic]. You must cure this by removing evry body [sic] except for you & your 2 daughters.

The seven–day notice further stated that if Sparks failed to either cure the violations within seven days or obtain a written agreement with the Park allowing for a variance, the Park would commence eviction proceedings against her pursuant to the Utah Mobile Home Park Residency Act, Utah Code Ann. §§ 57–16–1 to –15.1 (1994 & Supp.1999). The sixty–day notice listed numerous additional rules violations and also afforded Sparks the opportunity to seek a variance from the rules or a variance from the time period she had to cure the violations.[1]

¶ 7 Sparks admits she neglected to cure all of the violations listed in the seven–day notice. Sparks also neglected to obtain a variance from the rules violations listed in the seven–day notice or from the seven–day cure period. Instead, she merely claims that she left a telephone message for the Park manager.[2]

---

1. The violations listed in the sixty-day notice included the failure to install a shed, a carport, handrails on the back steps, a bottom track for the home's skirting, and a painted rear deck with an awning, rails, handrails, carpet, and skirting.

2. Malibu denies that Sparks left a message at the Park office. Regardless, while both notices in-

formed Sparks that she could request a variance in the rules or a longer cure period, the lease provided:

> If, at any time, a Lessee believes the Park has not fulfilled any obligations the Park may have to Lessee or other homeowners, Lessee agrees to immediately give the Park written notice specifying what Lessee believes the Park

¶ 8 Accordingly, on July 25, 1997, Malibu filed a complaint in Third District Court seeking to evict Sparks from the Park for breach of the lease and failure to comply with the seven–day notice. On October 22, 1997, after the sixty–day period expired, Malibu amended its complaint to include Sparks' failure to comply with the sixty–day notice as additional grounds for eviction.[3]

¶ 9 Sparks defended against Malibu's eviction action by contending that she did not breach her lease agreement. In the alternative, Sparks alleged that she was excused from complying with the two notices because the notices were (1) unconscionable, (2) a breach of contract, (3) a breach of the implied covenant of good faith and fair dealing, and (4) a violation of the state and federal fair housing acts. Sparks also filed a counterclaim setting forth discrimination claims under the fair housing acts. Malibu moved for summary judgment on its eviction claim on the basis of the undisputed fact that Sparks, by her own admission, failed to cure the many rule violations set forth in the seven–day and sixty–day notices. Additionally, Sparks filed her own motion for summary judgment on the fair housing violations she alleged in her counterclaim.

¶ 10 The trial court granted summary judgment in favor of Malibu on its eviction claim because of the undisputed facts that Sparks violated Park rules and failed to cure them.[4] Additionally, the court concluded that the alleged fair housing violations were no defense to the eviction action: "[A]ny alleged discrimination does not estop the Park from terminating the leasehold for Mrs. Sparks' failure to abide by the rules." The court also denied Sparks' motion for summary judgment on her fair housing counterclaim, concluding that Sparks lacked standing to pursue a claim under either fair housing act. Regardless of standing, the court also concluded that Sparks' arguments under the fair housing acts "lack[ed] any factual or legal basis to grant summary judgment."

¶ 11 Sparks appeals the trial court's grant of summary judgment in favor of Malibu on its claim to evict her and its denial of her motion for summary judgment on her fair housing counterclaim. Sparks contends that the trial court erred in granting Malibu's motion for summary judgment because (1) issues of fact remain as to whether Malibu's enforcement of its rules was unconscionable and in bad faith; and (2) Malibu's fair housing act violations are a complete defense to eviction. In addition, Sparks alleges that the trial court erred in denying her motion for summary judgment on her fair housing counterclaim because, she contends, the seven–day notice and Malibu's rule restricting mobile home occupancy to one family violated the fair housing acts. Thus, the two issues we review are whether the trial court correctly concluded that Malibu was entitled to summary judgment on its eviction claim, and whether the trial court correctly concluded that Malibu did not violate the fair housing acts.

---

has failed to do and indicating what Lessee believes the Park has to do in order to fulfill these obligations.

Thus, it was Sparks' duty under the lease to notify the Park in writing if Sparks had believed, for example, that any of the rules violations listed in the seven-day or sixty-day notice were unjustified. Such a written complaint could also have sought to clarify Malibu's intention in requiring Sparks to remove everyone except herself and her two daughters from the mobile home.

3. Sparks failed to cure any of the violations listed in the sixty-day notice and also failed to obtain a variance from the rules violations or the cure period under the sixty-day notice. She argues that Malibu's filing of this eviction action after the seven-day period expired but before the sixty-day period expired placed her in an untenable position with regard to the sixty-day notice and that to require her to comply with the sixty-day notice while eviction was pending under the seven-day notice would be unconscionable. However, we do not reach this argument because, as we discuss below, Sparks' admitted failure to cure all of the violations listed in the seven-day notice is dispositive of whether summary judgment was proper on Malibu's eviction claim.

4. The trial court denied Sparks' summary judgment motion "for all of the reasons set forth in [Malibu]'s Reply Brief" and granted Malibu's summary judgment motion "for all of the reasons set forth in [Malibu]'s memorand[a]." Thus, we summarize the reasons listed in Malibu's reply memorandum in support of its summary judgment motion and memorandum in opposition to Sparks' summary judgment motion.

## STANDARD OF REVIEW

¶ 12 We review the trial court's grant or denial of a motion for summary judgment for correctness and accord no deference to the trial court's conclusions of law. *See Thompson v. Jess,* 1999 UT 22, ¶ 12, 979 P.2d 322, 325 (Utah 1999). A party is entitled to summary judgment only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See id.;* Utah R. Civ. P. 56(e).

## ANALYSIS

### I. MOBILE HOME PARK RESIDENCY ACT

¶ 13 Sparks claims that the trial court erred in granting summary judgment in favor of Malibu on its eviction claim under the Utah Mobile Home Park Residency Act (the "MHPRA"). Sparks argues that summary judgment in favor of Malibu was error because she "substantially complied with all proper requests" listed in the seven–day notice. She also claims that issues of fact remain as to whether Malibu's enforcement of its rules was in bad faith. We examine these allegations under the MHPRA.

### A. Substantial Compliance

¶ 14 The purpose of the MHPRA is twofold: first, to provide park owners with speedy and adequate remedies against residents who violate the terms of their tenancy; and second, to protect park residents from actual or constructive eviction by park owners. *See* Utah Code Ann. § 57–16–2 (1994). One of the protections afforded to park owners under the MHPRA is the ability to "promulgate rules related to the health, safety, and appropriate conduct of residents and to the maintenance and upkeep of such park." *Id.* § 57–16–7(1)(a) (Supp.1999). The MHPRA also provides a procedure through which a park owner may enforce park rules, provided that the rules satisfy the requirements of section 57–16–7(1)(a). The MHPRA provides in pertinent part:

(1) An agreement for the lease of mobile home space in a mobile home park may be terminated by mutual agreement or for any one or more of the following causes:

(a) failure of a resident to comply with a mobile home park rule:

(i) relating to repair, maintenance, or construction of awnings, skirting, decks, or sheds for a period of 60 days after receipt of a notice of noncompliance from the mobile home park; or

(ii) relating to any other park rule for a period of seven days after receipt of notice of noncompliance from the mobile home park....

*Id.* § 57–16–5(1)(a). Thus, so long as the park rule at issue is "related to the health, safety, and appropriate conduct of residents and to the maintenance and upkeep of such park," *id.* § 57–16–7(1)(a), the park owner may enforce the rule by serving a notice that complies with section 57–16–5(1)(a). The notice must "set forth the cause for the notice and, if the cause is one which can be cured, the time within which the resident has to cure." *Id.* § 57–16–6(2). If the resident fails to cure a violation listed in a notice that meets these statutory requirements, a park owner may terminate the lease and commence eviction proceedings. *See id.* § 57–16–15.1.

¶ 15 In the case before us, Sparks admits that she failed to cure all of the violations listed in the seven-day notice within the seven-day period and that she failed to submit a written request for a variance. The seven-day notice directed that Sparks trim her tree so that it did not overhang a neighbor's mobile home, pursuant to a Park rule stating that "[e]ach resident shall ... control the growth of all trees ... to preserve the appearance of the space and to avoid fire or other health and safety hazards." Sparks admits that she failed to trim her tree within the seven-day period and that she did not obtain a variance allowing her more time to perform this task.

¶ 16 In addition, the seven-day notice directed Sparks to replace her damaged back door, replace broken windows, and clean and paint her air conditioner pursuant to a Park rule that states: "The exterior of the manufactured home, accessory structures and skirting must be maintained in a well kept fashion. No cracked glass, broken doors or

windows will be allowed.... Visible or unsightly rust, corrosion, fading, blistering, or cracking on painted surfaces is not allowed." Sparks admits that she failed to cure these violations within the seven-day cure period. These rules regarding home and yard maintenance satisfy section 57–16–7(1)(a) because they are "related to the health, safety, and appropriate conduct of residents and to ... maintenance and upkeep." Utah Code Ann. § 57–16–7(1)(a) (Supp.1999). Thus, these rules violations constituted undisputed justification for eviction pursuant to the MHPRA.[5]

■ ¶ 17 Sparks' contention that she has "substantially cured" the rules violations in the seven-day notice fails to satisfy her burden in responding to Malibu's summary judgment motion. Even if we were to assume that she "substantially cured" the violations by curing some but not all of them, the MHPRA permits park owners to demand strict compliance with all legitimate park rules, as the court of appeals correctly recognized in *Crescentwood Village, Inc. v. Johnson*, 909 P.2d 1267, 1269 (Utah Ct.App.1995).

### B. Bad Faith

■ ¶ 18 Sparks also contends on appeal that summary judgment was precluded because Malibu enforced Park rules in bad faith, in violation of the implied covenant of good faith and fair dealing. Sparks' bad faith defense is based in part on her belief that Malibu singled her out for violations that were widespread throughout the rest of the Park. In support of her bad faith defense, Sparks points to a "survey" of the Park that she conducted on February 16, 1998, in which she discovered "many mobile homes in the Park that were in similar or worse condition than Kathy Sparks' mobile home." Sparks contends that her "survey" is sufficient to

create an inference that Malibu evicted her in bad faith.

■ ¶ 19 As a general rule, every contract is subject to an implied covenant of good faith and fair dealing, under which both parties to a contract promise not to "intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of a contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199 (Utah 1991). However, we also have stated that "we will not interpret the implied covenant of good faith and fair dealing to make a better contract for the parties than they made for themselves. Nor will we construe the covenant 'to establish new, independent rights or duties not agreed upon by the parties.'" *Brown v. Moore*, 973 P.2d 950, 954 (Utah 1998) (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991)) (other citations omitted).

¶ 20 The lease agreement between Sparks and Malibu permits Malibu to terminate the lease "unilaterally" for failure to follow Park rules. As we have concluded, Malibu's eviction proceedings were proper under the lease and the MHPRA because Sparks failed to cure violations of Park rules and failed to submit a proper request for a variance. Moreover, nothing in the lease agreement or the MHPRA would require Malibu to commence eviction procedures against other residents of the Park prior to bringing an action to evict Sparks. Under these circumstances, Sparks' "survey" of the Park is immaterial to whether Malibu is entitled to judgment as a matter of law on its action to evict Sparks.[6]

### II. FAIR HOUSING ACTS

¶ 21 We now examine whether the trial court properly found that Malibu did not

---

5. As to the ten other violations listed in the seven-day notice, Sparks claims to have fully cured three and partially cured four, and she claims that three are invalid. The allegedly cured violations include (1) cleaning her gutters, (2) removing nonpatio furniture from her deck, and (3) mowing, watering, and trimming her lawn. With respect to the allegedly partially cured violations, Sparks claims that (1) rather than removing an old wooden fence, she repaired it, (2) rather than replacing bent siding, she fixed large dents, (3) rather than replacing a

bent water heater door, she repaired it, and (4) rather than removing hard water stains from the windows, she washed the windows. She claims that three of Malibu's demands were invalid because (1) the rules did not require her to resod her yard, (2) she had permission to park on her lawn, and (3) her shutters were not broken.

6. For these same reasons, Sparks' arguments regarding "justified expectations" and unconscionability are without merit.

violate the Federal Fair Housing Act (the "FFHA" or "Title VIII"), 42 U.S.C.A. §§ 3601–3631 (1994),[7] and the Utah Fair Housing Act (the "UFHA"), Utah Code Ann. §§ 57–2–1 to –14 (1994 & Supp.1999). Sparks contends that summary judgment in favor of Malibu on its eviction claim was error because Malibu violated the fair housing acts. She also alleges that the trial court erred in denying her own motion for summary judgment on her counterclaim for relief under the fair housing acts. Whether Malibu violated the fair housing acts is dispositive of both Sparks' defense and counterclaim.

¶ 22 In her defense and counterclaim, Sparks contends that Malibu discriminated on the basis of "familial status" under the fair housing acts. "Familial status" discrimination, under both the FFHA and the UFHA, generally refers to discrimination in regard to housing against a child being domiciled with a parent or legal guardian.[8] *See* 42 U.S.C.A. § 3602(k) (1994); Utah Code Ann. § 57–21–2(14) (Supp.1999). Sparks argues that Malibu discriminated against her grandchild on the basis of familial status by requiring her (in the seven-day notice) to remove everyone except for Sparks and her two daughters,[9] and by establishing a rule restricting mobile home occupancy to one family per mobile home (the "one-family

rule"),[10] which allegedly discriminates against "multi-generation" families, such as that of Sparks. Specifically, Sparks contends that the seven-day notice is a "discriminatory action" in violation of section 3604(b) of the FFHA and section 57–21–5(1)(b) of the UFHA, and that the notice and the one-family rule are "discriminatory statements" in violation of section 3604(c) of the FFHA and section 57–21–5(2) of the UFHA. Before addressing either of these allegations and the corresponding statutes in detail, we must determine whether Sparks has standing to raise her defense or counterclaim under the FFHA and the UFHA.

*A. Standing Under the Fair Housing Acts*

■ ¶ 23 The trial court determined that Sparks lacks standing to sue under the FFHA or the UFHA. Malibu contends that we should uphold the trial court on this issue because the definition of "familial status" under the acts does not include Sparks. According to Malibu's argument, "familial status" refers to a child domiciled with a parent or guardian, and Sparks is not the parent or guardian of her adult daughter's child. *See* 42 U.S.C.A. § 3602(k) (1994); Utah Code Ann. § 57–21–2(14) (1994). To determine

---

7. The Federal Fair Housing Act was passed as Title VIII of the Civil Rights Act of 1968.

8. Specifically, the FFHA defines "familial status" as follows:

> (k) "Familial status" means one or more individuals (who have not attained the age of 18 years) being domiciled with
> (1) a parent or another person having legal custody of such individual or individuals; or
> (2) the designee of such parent or other person having such custody, with the written permission of such parent or other person.

42 U.S.C.A. § 3602(k) (1994). The UFHA provides essentially the same definition:

> (14) (a) "Familial status" means one or more individuals who have not attained the age of 18 years being domiciled with:
> (i) a parent or another person having legal custody of such individual or individuals; or
> (ii) the designee of the parent or other person having custody, with the written permission of the parent or other person.
> (b) The protections afforded against discrimination on the basis of familial status shall apply to any person who:
> (i) is pregnant;

(ii) is in the process of securing legal custody of any individual who has not attained the age of 18 years; or
(iii) is a single individual.
Utah Code Ann. § 57–21–2(14) (Supp.1999).

9. Malibu explains that this provision in the seven-day notice was prompted by reports that numerous unrelated, unauthorized persons were living with Sparks in her mobile home in violation of Park rules. Sparks disputes this contention and claims that the eviction was prompted by Malibu's desire to remove Sparks' grandchild from the Park. Malibu concedes knowledge that Sparks' grandchild resided with Sparks and denies that the seven-day notice was premised upon a desire to rid the Park of Sparks' grandchild. However, this dispute is not material to our conclusions as to the correctness of summary judgment.

10. Malibu's one-family rule states in full, "No subletting, renting, or occupation by more than one family per home will be permitted, except with express written approval from management." The rule does not otherwise define what constitutes a family.

standing, we look to those provisions in the acts describing those who may bring suit.

¶ 24 Both the FFHA and the UFHA grant standing to "aggrieved person[s]." 42 U.S.C.A. § 3613(a)(1)(A) (1994); Utah Code Ann. § 57–21–12(1) (Supp.1999). The FFHA defines "aggrieved person" to include

any person who—

(1) claims to have been injured by a discriminatory housing practice; or

(2) believes that such person will be injured by a discriminatory housing practice that is about to occur.

42 U.S.C.A. § 3602(i) (1994). Similarly, the UFHA defines the term to include

any person who:

(a) claims to have been injured by a discriminatory housing practice; or

(b) believes that he will be injured by a discriminatory housing practice that is about to occur.

Utah Code Ann. § 57–21–2(1) (Supp.1999).

¶ 25 In the instant case, Sparks asserts that she has been, or will be, injured by Malibu's discriminatory practices based on familial status because, as she alleges, Malibu's seven-day notice mandated either the removal of her grandson or the eviction of Sparks, her two daughters, and her grandson. This alleged injury is sufficient to make Sparks an "aggrieved person" under the FFHA. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Mountain Side Mobile Estates v. Secretary of HUD,* 56 F.3d 1243, 1249 (10th Cir.1995). We hold that such alleged injury is also sufficient to qualify Sparks as an "aggrieved person" under the UFHA. Thus, Sparks has standing to raise a defense or counterclaim under the FFHA and the UFHA. We next consider whether Sparks' contentions under those acts withstand summary judgment.

### B. Sparks' Allegation of Discrimination Under Sections 3604(b) and 57–21–5(1)(b)

¶ 26 Sparks first asserts that Malibu took a discriminatory action on the basis of familial status, in violation of section 3604(b) of the FFHA and section 57–21–5(1)(b) of the UFHA, when Malibu issued the seven-day notice. Section 3604(b) states that it shall be unlawful

(b) [t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, *familial status,* or national origin.

42 U.S.C.A. § 3604(b) (1994) (emphasis added). The analogous Utah provision, section 57–21–5(1)(b), states in pertinent part:

(1) It is a discriminatory housing practice to do any of the following because of a person's race, color, religion, sex, national origin, *familial status,* source of income, or disability:

. . . .

(b) discriminate against any person in the terms, conditions, or privileges of the sale or rental of any dwelling or in providing facilities or services in connection with the dwelling. . . .

Utah Code Ann. § 57–21–5(1)(b) (1994) (emphasis added).

¶ 27 Federal courts have explained that a plaintiff may recover under section 3604(b) by successfully alleging either of two theories.[11] The appropriate theory depends upon the manner in which the alleged discrimination occurred. The first theory is *disparate treatment,* which requires a plaintiff to show that the landlord has intentionally treated the plaintiff differently from other persons or groups. *See Harris v. Itzhaki,* 183 F.3d 1043, 1051 (9th Cir.1999); *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501

---

**11.** The language and apparent policy of section 57–21–5(1)(b) of the UFHA are so similar to that of section 3604(b) of the FFHA that it is appropriate to look to federal law as persuasive authority when interpreting the UFHA. Other states have similarly relied on FFHA case law when interpreting their own fair housing acts. *See, e.g., Chestnut Realty, Inc. v. Commission on Human Rights & Opportunities,* 201 Conn. 350, 514 A.2d 749, 754 (1986); *State v. Keding,* 553 N.W.2d 305, 307 (Iowa 1996).

(10th Cir.1995). The second theory is *disparate impact*, which instead involves a policy or practice of the landlord that is not intentionally discriminatory but is neutral on its face. *See Bangerter*, 46 F.3d at 1501; *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 933 (2d Cir.), *aff'd*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (per curiam). Disparate impact theory requires a plaintiff to show that the landlord's rule or policy, when applied, results in a discriminatory effect; that is, the policy affects one group or class of people differently from another group or class of people. *See Huntington Branch*, 844 F.2d at 933–34. Thus, whether a plaintiff alleges discrimination based on familial status, race, national origin, or any of the other bases listed in section 3604(b), a plaintiff must show either (1) intentional *disparate treatment*, or (2) *disparate impact*, without proof of discriminatory intent. *See Bangerter*, 46 F.3d at 1501.[12]

¶ 28 In the case before us, Sparks fails to distinguish whether her discrimination claim is for disparate treatment or disparate impact. Citing disparate impact cases, Sparks merely contends that Malibu's one-family rule and the seven-day notice "had a discriminatory effect" upon her. Regardless, Sparks' allegation of a 3604(b) violation fails under either a disparate impact or a disparate treatment theory. Sparks' claim fails under a disparate impact argument because she points to no general policy of Malibu that has caused a differential impact on a particular group or class of people. "[D]iscriminatory impact cannot be established where you have just one isolated decision." *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir.1981); *see also Michigan Protection & Advocacy Serv., Inc. v. Babin*, 799 F.Supp. 695, 706 (E.D.Mich.1992) ("Plaintiffs complain about a single allegedly discriminatory transaction. As such, the scope of this case is too narrow to qualify as one involving a discriminatory impact."), *aff'd*, 18 F.3d 337, 348 (6th Cir.1994). The single act of Sparks' eviction, including the purported "discrimina-

tory effect" therefrom, is insufficient to constitute a disparate impact.

¶ 29 Sparks' claim also fails under disparate treatment theory because she fails to refute valid justifications Malibu presented for her eviction. A plaintiff can show disparate treatment through one of two methods. The first method, also known as the "direct method," requires a plaintiff to show that the defendant has taken an action that is explicitly, facially discriminatory. *See Kormoczy v. Secretary, HUD*, 53 F.3d 821, 824 (7th Cir.1995); *Bangerter*, 46 F.3d at 1500 & n. 16. The defendant must then show that it would have taken action against the plaintiff anyway. *See Kormoczy*, 53 F.3d at 824. The "direct method" does not apply in the case before us because Sparks has failed to establish that the seven-day notice demonstrates, on its face, an intent to discriminate. The ambiguous directive in the seven-day notice fails to so demonstrate.

¶ 30 Even if the "direct method" were applicable to the case before us, as Justice Durham suggests, no dispute of material fact would preclude summary judgment in favor of Malibu. Justice Durham's conclusion to the contrary ignores Sparks' burden in contesting summary judgment. When a motion for summary judgment is properly made and supported, the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." Utah R. Civ. P. 56(e).

¶ 31 Applying rule 56 and the "direct method" to the instant case, no dispute of material fact exists, even assuming Sparks has shown that the notice constituted facial discrimination. *See Kormoczy*, 53 F.3d at 824. In support of its motion for summary judgment, Malibu presented numerous good-faith bases for evicting Sparks, and argued (as *Kormoczy* and Justice Durham would require) that it would have evicted Sparks even if her family were not "multi-generational." The burden in opposing summary judgment then shifted to Sparks to show that

---

12. We note that the federal courts look to Title VII employment discrimination cases for guidance regarding housing discrimination claims under Title VIII. *See Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir.1997); *Mountain Side*, 56 F.3d at 1251 n. 7. The disparate impact and disparate treatment analyses under Title VIII are analogous to those under Title VII.

Malibu would not have evicted Sparks if her family were not "multi-generational." To show that her eviction was based entirely on her "multi-generational" family, Sparks necessarily had to controvert Malibu's justifications for evicting her. She utterly failed to meet her burden in this regard. Indeed, she has openly admitted that she failed to cure numerous violations of her lease agreement with Malibu. Thus, Sparks has failed to show that Malibu would not have taken the same action against her absent the fact of her "multi-generational" family. As a result, under the "direct method," any dispute as to Malibu's purported discriminatory intent in issuing the seven-day notice is immaterial and does not preclude summary judgment.

¶ 32 The second method through which a plaintiff may establish disparate treatment requires a plaintiff to show that a defendant's purported justification for an allegedly discriminatory action is merely a pretext for discrimination. *See Gamble*, 104 F.3d at 305–06; *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (Title VII); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (Title VII). If a plaintiff then fails to produce evidence of pretext, the plaintiff's disparate treatment claim fails as a matter of law under either Title VII or Title VIII. *See, e.g., Gamble*, 104 F.3d at 305–06 (finding for defendant under Title VIII because defendant asserted valid justification for alleged discrimination and plaintiff failed to show evidence of pretext); *Shumway v. UPS*, 118 F.3d 60, 65 (2d Cir.1997) (notwithstanding evidence of discrimination, affirming summary judgment in favor of employer under Title VII because employee failed to show that employer's justification for discharge was pretextual); *Essex v. UPS*, 111 F.3d 1304, 1309 (7th Cir.1997) (same); *Murray v. City of Sapulpa*, 45 F.3d 1417, 1421–22 (10th Cir.1995) (same). Thus, if a landlord presents multiple good faith justifications for an eviction, the tenant must show that the justifications are merely a pretext for discrimination. Otherwise, any alleged instance of discrimination is immaterial and the tenant cannot recover under a disparate treatment theory.

¶ 33 In this case, Malibu has set forth multiple valid, good-faith justifications for evicting Sparks. Therefore, to recover for disparate treatment, Sparks must show that Malibu's justifications for evicting her are merely a pretext for discrimination. Sparks has failed to do so. She admits that she failed to cure all of the violations listed in the seven-day notice. Thus, because Sparks has failed to show pretext, the alleged discrimination by Malibu in the seven-day notice is immaterial, and Sparks' allegation that Malibu violated section 3604(b) and its Utah Code counterpart, section 57–21–5(1)(b), fails as a matter of law.

### C. Sparks' Allegation of Discriminatory Statements Under Sections 3604(c) and 57–21–5(2)

¶ 34 Sparks also alleges that Malibu's one-family rule and the seven-day notice are statements indicating discrimination on the basis of familial status in violation of section 3604(c) of the FFHA and section 57–21–5(2) of the UFHA. However, these allegations are not properly before this court. Sparks did not raise any claim or defense under sections 3604(c) and 57–21–5(2) before the trial court and therefore waived any right to raise such a claim or defense in appealing the trial court's grant of summary judgment. *See Certified Sur. Group, Ltd. v. UT Inc.*, 960 P.2d 904, 906 n. 3 (Utah 1998); *State Farm Mut. Auto. Ins. Co. v. Clyde*, 920 P.2d 1183, 1185 (Utah 1996). Thus, Sparks' argument under section 3604(c) of the FFHA and section 57–21–5(2) of the UFHA fails.

### CONCLUSION

¶ 35 We conclude that the trial court correctly granted summary judgment in favor of Malibu on its eviction claim. In addition, the trial court properly denied Sparks' summary judgment motion on her fair housing counterclaim. Because we conclude that Sparks does not prevail on any of her grounds for appeal, she is not entitled to attorney fees.

¶ 36 Chief Justice HOWE and Justice STEWART concur in Justice RUSSON's opinion.

ZIMMERMAN, Justice, concurring and dissenting:

¶ 37 I dissent from the affirmance of the summary judgment for the reasons stated by Associate Chief Justice Durham in that portion of her opinion discussing Sparks' section 3604(b) claim. I agree with her that material facts are in dispute that preclude a summary judgment and that the defendant landlord cannot rely upon other alleged violations of the lease agreement until after the unlawful discrimination claim is adjudicated.

¶ 38 I join the majority in refusing to consider other issues. The language that Justice Durham relies upon from *Kaiserman Associates, Inc. v. Francis Town*, 977 P.2d 462 (Utah 1998), to justify addressing those claims was never intended to sweep aside our usual requirements for preserving error and for raising issues in an orderly fashion. It may be true that on occasion this court, like all appellate courts, reaches out to decide issues that are not presented as they should be. But those occasions are the exception, not the rule. And we have been careful to keep those cases the exception so that the refining process that occurs through proper claim preservation and development through the trial and appellate courts brings issues to us fully developed and briefed, and with the benefit of thorough consideration by other judges in the trial and intermediate appellate courts. In my view, the present situation is not one that warrants giving the other issues addressed by Justice Durham exceptional treatment.

DURHAM, Associate Chief Justice, dissenting:

¶ 39 I respectfully dissent. Plaintiff Kathy Sparks ("Sparks") has raised genuine issues of material fact regarding whether defendant Malibu Investment Co. ("Malibu") discriminated against her based upon the protected category of "familial status." The landlord sent a notice to Sparks that was facially discriminatory, requiring her to remove her grandchild from the mobile home unit they resided in together. The basic principles of federal and Utah fair housing and discrimination law require that in a case with disputed issues of material fact, Sparks be given a chance to prove that a discriminatory act occurred.

¶ 40 This case centers on the meaning and significance of a seven-day notice served by Malibu on Sparks. The seven-day notice states the following:

> You are violating Rule 7 # 3 because you have more people living in the home than you are registered with. This rule says that no occupation by more than one family without permittion [sic] from management. You must cure this by *removing evry body [sic] except for you & your 2 daughters.*

(Emphasis added.)

¶ 41 Malibu's evidence in the trial court rested largely on the affidavit and supplemental affidavit of Mark Prigmore ("Prigmore"), the manager of the mobile home park property and Malibu's agent. Prigmore admits that when he served the seven-day notice, he knew "that the Defendant's daughter was living with her and I knew that the Defendant's Daughter [sic] had a baby." Malibu thus knew of the child's presence in Sparks' home when it served a notice that, by its literal terms, required that Sparks remove the child.

¶ 42 Furthermore, Sparks provided sworn testimony in affidavits and in her deposition that she read this notice according to its literal terms. That is, she understood this notice to require her to either remove her grandchild from the house or move. Sparks' affidavit states, "Plaintiff specifically required that my grandchild who lives in my mobile home leave the park [sic] as a condition of my continued residency in the Park.... The only person residing in the mobile home except for me and my two daughters is my grandchild."

¶ 43 During Sparks' deposition, the following colloquy took place:

Q: The notice says that that daughter [the child's mother] can stay, correct?

A: Correct.

Q: So you inferred that because they didn't say the baby could stay specifically that the baby had to go?

A: Correct.

¶ 44 As to what was communicated after the seven-day notice was served, the record shows crucial inconsistencies. Prigmore's supplemental affidavit states: "The Park is not attempting to evict Mrs. Sparks because she has more than one family living in her residence. She at one time had other adult [sic], other than her family, living with her when the notices were served.[1] The Park would have gladly entered into an agreement to permit her grandson to reside in her home with her two daughters. Mrs. Sparks took no action to request such permission from the Park."

¶ 45 It is unclear what Prigmore's time-frame is, but since he is discussing serving the notices, it is likely that what he means is that the Park was willing to enter into such an agreement with Sparks *after* the notice was served. In that case, Prigmore is conceding that Malibu *did intend* the notice to require the child's removal. Malibu thus appears to concede that the notice required removal of Sparks' grandchild and that it understood and intended it to do so.

¶ 46 Prigmore swore to a conversation with Sparks shortly after the notice was served in which he told her that his purpose was not to require the child's removal, but rather "with respect to the unauthorized persons was to force [Sparks] to remove the numerous other adult persons who have been living with her." In the Sparks deposition, however, the facts are stated quite differently:

Q: When you received this seven-day notice and you saw that only your two daughters could stay, as you interpreted it, did you go to management and ask them about the baby?

A: I called them on the phone. Like I say, I can't go in to see them because they're in the office, I work during the day. By the time I get home from work they're gone. So I had called him to ask about this. Well of course they're not there. So I left a message on the answering machine and he never replied, returned my phone call.

¶ 47 Prigmore appears to contradict himself, and support Sparks, when he states in his supplemental affidavit, "Had Mrs. Sparks *approached the Park* for assistance with more time to comply with the rule violation, the Park would have graciously done everything in its power to help her." (Emphasis added.) Thus, there appears to be a dispute regarding whether Prigmore ever communicated his subjective intentions to Sparks.

¶ 48 Malibu, however, contends that the seven-day notice, whatever it says regarding the grandchild, was motivated by the presence of other, unregistered adults in Sparks' home. Sparks testified in her deposition to the following:

Q: Was there anyone besides the four people mentioned in the home at the time of the seven-day notice, yourself, your two daughters and your grandchild?

A: That's it.

¶ 49 When asked about other temporary guests in her home, Sparks testified that her grandson's father had been the longest temporary guest in her home, staying about two months, and that she had verbally informed "Mark" (Prigmore) about his presence. According to Sparks, Prigmore approved the guest, as long as it was only "temporary"; he did not define temporary. Another "temporary visitor," who, Sparks testified, probably did not even sleep at her home, was Sparks' mother. She came for perhaps five or seven days to take care of Sparks' eight-year-old daughter while Sparks was in the hospital. Sparks did not testify about any other guests or visitors. Malibu's lawyer did not ask about any other guests by name during Sparks' deposition. Prigmore did not testify to anything more specific than "unauthorized persons" and "numerous other adult persons."

¶ 50 Taken in the light most favorable to Sparks, then, the evidence is that Malibu served a notice on her, knowing and intending it to require that she remove her grand-

---

1. It is not entirely clear that this sentence represents a sworn statement that other adults were living with Sparks at the time the seven-day notice was served. We assume, however, that the phrase "at one time" is merely sloppy draftsmanship rather than an attempt to evade the perjury statute.

child. Furthermore, at the time the notice was served, no other person was living in the home to whom the notice could have referred. When Sparks attempted to contact the Park manager, he failed to return her phone call. Although Malibu may have been willing to waive its demand that Sparks remove the child, it never communicated this willingness to her.[2]

## SPARKS' SECTION 3604(B) CLAIM

¶ 51 There are two methods a plaintiff may use to establish a disparate treatment discrimination claim under section 3604(b) of the Fair Housing Act: directly, using either direct or circumstantial evidence, or indirectly, utilizing the "inferential burden method" outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Kormoczy v. Secretary, United States Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823–24 (7th Cir.1995). Direct evidence is evidence which can be interpreted as acknowledging the defendant's discriminatory intent. *See id.* at 824. "Where direct evidence is used to show that a housing decision was made in violation of the [FHA], the burden shifting analysis is inapposite." *Id.* As the United States Supreme Court stated in a Title VII case, "[W]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on *why* the employer discriminates but rather on the explicit terms of the discrimination." *International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 199, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (emphasis added), *quoted in Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500–01 (10th Cir.1995). *International Union* continues, "[T]he absence of a malevo-

lent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *Id.* "Specifically with regard to housing discrimination, a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination where the defendant expressly treats someone protected by the FHA[ ] in a different manner than others." *Bangerter*, 46 F.3d at 1501 (citation omitted).

¶ 52 The seven-day notice says that Sparks "must" cure the alleged violation that gave rise to the notice by "removing evry body [sic] except for you & your 2 daughters." The notice could not be more clear. The notice constitutes direct or circumstantial evidence from which a jury could infer that Malibu intended to evict Sparks because of the presence of her grandchild. Analogizing to the statutory interpretation context, omissions are significant and should therefore "be taken note of and given effect." *Kennecott Copper Corp. v. Anderson*, 30 Utah 2d 102, 514 P.2d 217, 219 (1973). The burden now shifts to Malibu to "prove by a preponderance of the evidence that it would have made the same decision absent the impermissible factor." *Kormoczy*, 53 F.3d at 824.[3]

¶ 53 The majority states that Malibu has asserted "multiple valid, good-faith justifications" for Sparks' eviction, and absent a showing of pretext, the "alleged discrimination by Malibu in the seven-day notice is immaterial." This is incorrect for two reasons: first, Sparks has offered convincing evidence of direct discrimination and, second, even if one were using a *McDonnell Douglas* burden shifting analysis, Sparks has countered Malibu's "good-faith justifications" with testimony that contradicts their assertions

---

2. A jury could also find that the landlord chose to include the child in the eviction notice precisely to increase its bargaining power or to force Sparks to move even if the child was not the primary motivation. This use of an illegal discriminatory action is clearly prohibited by the law. A tenant should not be expected to treat a child as a bargaining chip or to contemplate splitting up a family. If the landlord has other disputes with a tenant, it must resolve those disputes without discriminatory statements and actions.

3. Nevertheless, the majority states that "if a landlord presents multiple good faith justifications for an eviction, the tenant must show that the justifications are merely a pretext for discrimination. Otherwise, any alleged instance of discrimination is immaterial and the tenant cannot recover under a disparate treatment theory." This assertion is wrong. Sparks has presented clear evidence of facial discrimination, and need not engage in a *McDonnell Douglas*-type evidentiary probe.

regarding her "numerous" and/or "unregistered" guests. Summary judgment cannot be granted with regard to the seven-day notice because both Malibu's intent and the underlying violations are disputed.

¶ 54 The majority relies on several admittedly still uncured maintenance violations listed in the seven-day notice as "dispositive" of whether summary judgment was properly granted on Malibu's eviction claim. In my view, Malibu should be estopped from arguing that the cure period of seven days has run; thus, Sparks is not yet in violation of the notice. Requiring Sparks to cure the maintenance violations before litigating whether the notice constitutes illegal discrimination would place before her a Hobson's choice of spending her scarce resources to cure the maintenance violations with the possibility that she would have to move anyway if the seven-day notice were found to be nondiscriminatory. Sparks has sworn that she makes approximately $5.80 per hour sewing piecework and that she could not spend the money curing the maintenance violations before she knew the outcome of the lawsuit. If the landlord had not illegally discriminated against her grandchild, Sparks would have been able to cure the maintenance violations. Therefore, the landlord's illegal action is the reason that she is in violation of the notice.

¶ 55 The majority relies on *Crescentwood Village, Inc. v. Johnson*, 909 P.2d 1267 (Utah Ct.App.1995), to uphold the landlord's position that Sparks' eviction is legal. The instant case, however, is clearly distinguishable from *Crescentwood*. In *Crescentwood*, the landlord served a notice similar to the ones served on Sparks, to the effect that *future* violations of these rules would result in eviction without a further opportunity to cure. *See id.* at 1268. In *Crescentwood*, the tenant cured all of the violations, and later committed new violations. *See id.* Here, Sparks is still on round number one in that she has not had a chance to cure her violations while not also under the threat of having to leave her home because her grandchild cannot stay. Surely, under these circumstances, Sparks should not be bound by the *Crescentwood* standard. It permits the landlord to both

create the circumstances of an illegal eviction and get away with it.

## SPARKS' SECTION 3604(C) CLAIM

¶ 56 I also disagree with the majority's refusal to consider Sparks' claims and defenses under sections 3604(c) of the FHA and 57–21–5(2) of the Utah Fair Housing Act ("UFHA"), because Sparks did not raise these claims and defenses below. In *Kaiserman Associates, Inc. v. Francis Town*, 977 P.2d 462 (Utah 1998), this court explained that while the court ordinarily prefers to decide an appeal based on the arguments presented by the litigants, there are times when it is appropriate to go beyond those arguments. *See id.* at 464. This court stated, "In our view, an overlooked ... argument should not compel an erroneous result. We should not be forced to ignore the law just because the parties have not raised or pursued obvious arguments." *Id.* Unlike *Kaiserman*, this issue *was* raised on appeal, and further, the section 3604(c) claim involves exactly the same issues of fact as the section 3604(b) claim. It is widely acknowledged that "[t]he rule that a reviewing court will address only issues in the trial court is not absolute.... [T]here are numerous situations in which a reviewing court may reach an issue notwithstanding ... its being presented for the first time on appeal." 5 Am. Jur.2d *Appellate Review* § 691 (1995). One area in which it is appropriate to make such an exception is when the matter is of "sufficient public concern." *Id.* Certainly, the area of housing discrimination is one of vital concern to the public, and in this narrow circumstance, I would make the exception and consider defendant's claim and defense.

¶ 57 Section 3604(c) prohibits the making or publishing of any notice, statement, or advertisement concerning the rental of a dwelling that indicates any preference or limitation based on familial status. *See* 42 U.S.C. § 3604(c) (1994). Many cases have held or recognized that the test for determining whether a violation has occurred is whether, given the natural interpretation of the words, it would indicate to the ordinary reader or listener, who is neither the most suspicious nor the most insensitive of readers

or listeners, a discriminatory preference or limitation. *See Jancik v. Department of Hous. & Urban Dev.,* 44 F.3d 553 (7th Cir. 1995); *Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc.,* 943 F.2d 644 (6th Cir.1991); *Ragin v. New York Times Co.,* 923 F.2d 995 (2d Cir.1991); *Spann v. Colonial Village, Inc.,* 899 F.2d 24 (D.C.Cir.1990); *United States v. Hunter,* 459 F.2d 205 (4th Cir.1972); *Wilson v. Glenwood Intermountain Properties,* 876 F.Supp. 1231 (D.Utah 1995), *vacated and remanded on other grounds,* 98 F.3d 590 (10th Cir.1996); *Blomgren v. Ogle,* 850 F.Supp. 1427 (E.D.Wash.1993). While this standard has most often been used in the context of commercial advertising, it has been used between private individuals as well. *See Blomgren,* 850 F.Supp. at 1439–41 (apartment complex rules discriminated based on familial status). Additionally, "[s]ection 3604(c) may be violated without a showing of a subjective intent to discriminate." *Llanos v. Estate of Anthony Coehlo,* 24 F.Supp.2d 1052, 1057 (E.D.Cal. 1998) (citing *Jancik,* 44 F.3d at 556). Finally, "the finder of fact may consider the per se unlawful notices as relevant to the issue of Defendants' intent as to the ... 3604(b) claim[ ]." *Blomgren,* 850 F.Supp. at 1441.

¶ 58 The seven-day notice "indicates [a] preference, limitation, or discrimination based on ... familial status." 42 U.S.C. § 3604(c). No showing of intent on Malibu's part is necessary for Sparks to prove this claim or defense. This court should remand this issue to the trial court so that a fact-finder may determine whether a reasonable reader in Sparks' situation would have read the seven-day notice to require the eviction of her grandchild.

### LANDLORD–TENANT LAW

¶ 59 Even if a jury did not find that the notice was facially discriminatory or that Sparks proved a claim under sections 3604(b) and/or 3604(c) of the FHA, I would note another issue not raised by Sparks at any time during the course of this action, but which I believe is problematic.

¶ 60 The text of the notice that Sparks received from Malibu does not address whether it is specifically aimed at the removal of her grandchild, or any other complaint, such as excessive numbers of guests, that the landlord might have against her.[4] As such, the notice may have constituted a violation of her rights under both the Utah Mobile Home Park Residency Act (the "MHPRA"), Utah Code Ann. §§ 57–16–1 to –15.1 (1994 & Supp. 1999), and the Forcible Entry and Detainer Statute, *id.* §§ 78–36–1 to –12.6 (1996 & Supp.1999).

¶ 61 First, pursuant to the MHPRA, the landlord may terminate a lease for cause, including failure of a mobile home park resident's compliance with a mobile home park rule. *See id.* §§ 57–16–5 to –6 (Supp.1999). An action to terminate a lease for cause must be commenced with a written notice that "shall set forth the cause for the notice." *Id.* § 57–16–1(2) (Supp.1999).

¶ 62 The notice given by the landlord arguably did not set forth the cause in a fashion that was capable of being cured. First, if the landlord's concern was that Sparks had guests living with her who were not family, this notice was too vague and lacked specific information to inform Sparks of how she might remedy the situation. Second, the landlord's notice could have been aimed at attempting to evict Sparks' newborn grandson because of her failure to register him. The notion that a failure to register an infant could be a lease violation is so extraordinary that a landlord should be required to give a clearly worded notice that it regards this as a lease violation. Finally, the landlord might also have been claiming that Sparks' grandson was not her family member. Again, given that the infant's mother was a registered resident, such an extraordinary notion must necessarily be explicitly stated. Under these circumstances, the landlord's "notice" may not have complied with the requirements of the MHPRA.

---

**4.** I acknowledge that I have treated the wording of the seven-day notice differently for purposes of the discrimination analysis above and this analysis. Given the entirely different standards applicable in each area, and especially the difficulty and centrality of proving intent in discrimination cases, this is entirely appropriate.

¶ 63 Second, the general provision in the Utah Code regarding notice to a tenant for violation of a term of the lease, the forcible entry and detainer statute, requires the landlord to give "notice in writing requiring in the alternative the *performance of the conditions or covenant* or the surrender of the property." Utah Code Ann. § 78–36–3(1)(e) (1996) (emphasis added). Again, as in the notice requirement of the MHPRA, the landlord must specify what the conditions of performance are, so that the tenant can proceed in an attempt to cure the problem, thus avoiding the severe remedy of eviction. Regarding notice in a situation involving the nonpayment of rent, this court has long held that statutory notice provisions must be strictly complied with, and that notices which failed to offer the alternative of payment of rent *or* surrender of the premises were defective and void. *See Sovereen v. Meadows,* 595 P.2d 852, 853–54 (Utah 1979); *American Holding Co. v. Hanson,* 23 Utah 2d 432, 464 P.2d 592, 593 (1970); *Jacobson v. Swan,* 3 Utah 2d 59, 278 P.2d 294, 300 (1954). As the court in *Sovereen* noted, "The unlawful detainer statute is a summary proceeding and in derogation of the common law. It provides a severe remedy, and this Court has previously held that it must be strictly complied with before the cause of action may be maintained." *Sovereen,* 595 P.2d at 853 (citation omitted).

¶ 64 As noted above, the landlord did not give the type of notice required by the general notice statute applicable in tenancies outside of the mobile home park context. The notice was unclear as to whether the landlord's claim was that the grandchild was not a member of Sparks' family or that there were guests who were living in her trailer. Sparks could only speculate that there was something that the landlord wanted her to

cure, but she would have no idea what that was. Given this court's rulings that a landlord must take the highest level of care in providing a tenant with clear notice, it appears that the landlord did not spell out Sparks' alleged violation to her in a manner that would be capable of remedy.

¶ 65 Finally, in analogous situations under other statutes, courts have required clear notice. Inasmuch as housing is one of the basic necessities of life, the termination of a lease is an event requiring strong safeguards to protect tenants from losing their homes without adequate opportunity to cure. The case under review involves a mobile home park, where the tenant is often likely to lack the means to defend his or her rights.[5] In a somewhat analogous context, the United States Department of Housing and Urban Development (HUD) has promulgated a regulation requiring landlords of federally funded lower income housing programs to give specific notice to tenants of the reasons for their termination. The regulation provides that "[t]he landlord's determination to terminate the tenancy shall ... state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense." 24 C.F.R. § 247.4(a)(2) (1996). Noncompliance with the notice requirement will render the landlord's termination invalid. *See* 24 C.F.R. § 247.3(a) (1996); *Hill v. Paradise Apartments, Inc.,* 182 Ga.App. 834, 357 S.E.2d 288, 290 (1987).[6]

¶ 66 Noting the clear reason for the HUD regulation, the court in *Hill* stated, "The manifest purpose of the foregoing [regulation] is to afford procedural due process in eviction proceedings to tenants in federally subsidized housing projects, '... to cure the evils of discriminatory and arbitrary eviction procedures prevalent in federally-subsidized housing....'" *Hill,* 357 S.E.2d at 290 (in-

---

5. In a case involving a warranty of habitability defense in an unlawful detainer situation, this court noted the lack of bargaining power of low-income tenants, stating that they "often have no meaningful choice but to accept and continue to live in substandard housing." *P.H. Inv. v. Oliver,* 818 P.2d 1018, 1022 (Utah 1991). Thus, this court has explicitly acknowledged that low-income tenants can be forced to accept conditions in the terms of their rental housing that tenants with greater economic clout can reject.

6. Where the tenant has not been harmed, however, by the failure to provide adequate reasons for termination, at least two Georgia cases have found that a judgment of dispossession will not be overruled on appeal. *See Hill,* 357 S.E.2d at 290; *Smith v. Hendrix,* 162 Ga.App. 299, 290 S.E.2d 504, 507 (1982).

ternal quotation and citation omitted). While this regulation is inapplicable here, the reasoning is equally apposite under the state laws discussed above.

¶ 67 The landlord's notice to Sparks is also problematic from a due process point of view because of its apparent confusion: it is unclear whether Sparks was being told to evict her guests or to evict her grandchild. If the grandchild was the cause of the alleged violation, the notice should specifically have said this. Otherwise, the landlord may be engaging in an impermissible form of discrimination while camouflaging its actions. Given the difficulties of showing any type of discriminatory intent or discriminatory treatment, the landlord should be required to state its true aims in the notice.

## CONCLUSION

¶ 68 It has been noted:

Cases premised on alleged violations of the constitutional or civil rights of plaintiffs frequently are unsuitable for summary judgment. As is true with other cases involving important public issues, courts may refuse to grant summary judgment in these actions because it is felt that a fuller record is necessary in order to be able to decide properly the issues involved.

10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2732.2 (1998). This is such a case.

¶ 69 For the foregoing reasons, I respectfully dissent.

¶ 70 Justice STEWART acted prior to his retirement.